61 F.Supp. 209 (1945)
BAILEY FARM DAIRY CO. et al.
v.
JONES, War Food Adm'r, et al.
No. 3029.
District Court, E. D. Missouri, E. D.
June 5, 1945.
*210 *211 *212 *213 Karl P. Spencer, of St. Louis, Mo., and Max O'Rell Truitt and Carl McFarland, both of Washington, D. C., for plaintiffs.
*214 Harry C. Blanton, U. S. Atty., of Sikeston, Mo., J. Stephen Doyle, Sp. Asst. to Atty. Gen., and Earl J. Smith, of Washington, D. C., for defendants.
HULEN, District Judge.
This is a statutory proceeding by twenty-three milk "handlers"[1] in the St. Louis "area," against the Secretary of Agriculture and War Food Administrator, under Section 608c(15) (A, B)[2] of the Agricultural Adjustment Act (1933) as amended by the Agricultural Marketing Agreement Act of 1937, June 3, 1937, 50 Stat. 246, as amended, 7 U.S.C.A. § 601 et seq., to review a milk order made by the War Food Administrator (who by Executive Order No. 9322, 50 U.S.C.A.Appendix § 601 note, now performs functions of the Secretary of Agriculture in connection with milk orders under the Act) under the provisions of the Act, affecting the plaintiffs who are subject to the Act in the St. Louis "area" in their business as milk "handlers." The case is now before the Court on motion by defendants for summary judgment, based on the pleadings and certified transcript of the record made before the War Food Administrator in connection with the promulgation of the milk order and hearing on plaintiffs' "petition" for review there filed. Defendants include with their answer a counter claim asking for a mandatory injunction against plaintiffs to enforce the order under Section 608a(6), 7 U.S.C.A. § 608a(6).
Since 1936, there has been in effect in the St. Louis marketing area a Federal marketing agreement or order, first under the Agricultural Adjustment Act (as amended 1935) and then under the Agricultural Marketing Agreement Act of 1937, as amended. The order in general may be said to regulate the marketing of inspected fluid milk and fix the minimum prices which St. Louis handlers shall pay to producers for their milk. The order, known as Order Number Three, has been amended from time to time.
Pursuant to statutory notice, the War Food Administrator conducted a hearing in St. Louis, Missouri, on September 3, 1943, with respect to proposed amendments to the then existing marketing agreement, regulating the handling of milk in the St. Louis, Missouri, marketing area. All interested parties, including representatives of plaintiffs, participated in this hearing. As a result of this hearing, and based upon the record there made, in October, 1943, an amendment to the marketing agreement was proposed, in the form of an amended order. To the proposed amendment plaintiffs filed exceptions.
As a result of the exceptions filed, there were some modifications made in the proposed amendments to the marketing agreement, and as thus changed, the amended order was issued on December 27, 1943, by the Acting War Food Administrator, to become effective January 1, 1944.
On January 1, 1944, plaintiffs, pursuant to Section 608c(15) (A) (see footnote 2) of the Act, filed their petition, to the War Food Administrator, excepting to the amendments. A hearing on plaintiffs' exceptions was held on March 27, 28, 1944. On June 10, 1944, plaintiffs' exceptions were overruled by the hearing officer. To *215 this ruling plaintiffs again excepted. Oral arguments were heard in support thereof, and on September 27, 1944, on behalf of the War Food Administrator, the assistant to the War Food Administrator filed his decision and order denying the relief prayed for in the exception filed by plaintiffs. This action was then filed under Sec. 608c(15) (B) of the Act (see footnote 2).
Plaintiffs now attack the legality of the amended order, as to its substantive terms and as to the procedure before the Administrator upon which the amended order is based. Broadly classified, the particulars upon which plaintiffs base their complaint are directed:
First, to the classification of milk provided in Section 903.3(e) of the amended order.[3] The order classifies milk into Class One and Class Two. "Class One Milk shall be all milk the utilization of which is not established as Class Two Milk." Class Two Milk "shall be all milk the skim milk and butterfat of which is established (i) as having been used or disposed of in any form other than as milk, and (ii) as actual plant shrinkage, but not to exceed 3 percent of the total receipts of milk from producers." There seems to be agreement among the parties to this case that Section 903.3(e) of the Amended Order provides that the "handlers"[4] use, and if not used, to consider as used, the inspected or approved milk delivered to them by the "producers"[5] in Class One, up to 95% of the Class One uses of the handler before imported milk (meaning milk brought in from out of the marketing area) is considered as used in Class One. The plaintiffs object to this method or formula of classification under the amended order, for numerous reasons.
Second, plaintiffs except to the provisions of Section 903.3(a) of the amended order, which provides that "in establishing the classification of milk received by handlers from producers, the burden rests upon such handlers to account for such milk and to prove to the Marketing Administrator that such milk should not be classed as Class One Milk."[6]
*216 Third, plaintiffs question the legality of the butter fat differential, as contained in the amended order.
Fourth, plaintiffs assert that the amended order provides for increases in price to be paid to producers for milk, which are confiscatory and in violation of the Stabilization Act of 1942, 50 U.S.C.A.Appendix § 961 et seq.
Plaintiffs' complaint also presents questions with respect to procedure followed preceding issuance of the amended order.
The provisions of the Act with which the Court is now concerned, under the issues as presented, read as follows:
Title 7 U.S.C.A. § 608c, Orders Regulating handling of commodity 
"(1) Issuance by Secretary.
"The Secretary of Agriculture shall, subject to the provisions of this section, issue, and from time to time amend, orders applicable to processors, associations of producers, and others engaged in the handling of any agricultural commodity or product thereof specified in subsection (2) of this section. Such persons are referred to in this chapter as `handlers.' Such orders shall regulate, in the manner hereinafter in this section provided, only such handling of such agricultural commodity, or product thereof, as is in the current of interstate or foreign commerce, or which directly burdens, obstructs, or affects, interstate or foreign commerce in such commodity or product thereof.

* * * * *
"(3) Notice and hearing.
"Whenever the Secretary of Agriculture has reason to believe that the issuance of an order will tend to effectuate the declared policy of this chapter with respect to any commodity or product thereof specified in subsection (2) of this section, he shall give due notice of and an opportunity for a hearing upon a proposed order.
"(4) Finding and issuance of order.
"After such notice and opportunity for hearing, the Secretary of Agriculture shall issue an order if he finds, and sets forth in such order, upon the evidence introduced at such hearing (in addition to such other findings as may be specifically required by this section) that the issuance of such order and all of the terms and conditions thereof will tend to effectuate the declared policy of this chapter with respect to such commodity.
"(5) Milk and its products; terms and conditions of orders.
"In the case of milk and its products, orders issued pursuant to this section shall contain one or more of the following terms and conditions, and (except as provided in subsection (7)) no others:
"(A) Classifying milk in accordance with the form in which or the purpose for which it is used, and fixing, or providing a method for fixing, minimum prices for each such classification which all handlers shall pay, and the time when payments shall be made, for milk purchased from producers or associations of producers. Such prices shall be uniform as to all handlers, subject only to adjustments for (1) volume, market, and production differentials customarily applied by the handlers subject to such order, (2) the grade or quality of the milk purchased, and (3) the locations at which delivery of such milk, or any use classification thereof, is made to such handlers.
"(B) Providing:
"(i) for the payment to all producers and associations of producers delivering milk to the same handler of uniform prices for all milk delivered by them * * *.
"(ii) for the payment to all producers and associations of producers delivering milk to all handlers of uniform prices for all milk so delivered, irrespective of the uses made of such milk by the individual handler to whom it is delivered; subject, in either case, only to adjustments for (a) volume, market, and production differentials customarily applied by the handlers subject to such order, (b) the grade or quality of the milk delivered, (c) the locations at which delivery of such milk is made, and (d) a further adjustment, equitably to apportion the total value of the milk purchased by any handler, or by all handlers, among producers and associations of producers, on the basis of their marketings of milk during a representative period of time.

* * * * *
*217 "(G) No marketing agreement or order applicable to milk and its products in any marketing area shall prohibit or in any manner limit, in the case of the products of milk, the marketing in that area of any milk or product thereof produced in any production area in the United States."
In considering the legality of the amended order, the character of this Court's review is limited. New York State Guernsey Breeders Co-op. v. Wickard, 2 Cir., 141 F.2d 805. We are called upon to determine if the findings by the Administrative body are in accordance with the law. Vogt's Dairies, Inc. v. Wickard, D.C., 45 F.Supp. 94; M. H. Renken Dairy Co. v. Wickard, D.C., 45 F.Supp. 332; Queensboro Farm Products, Inc. v. Wickard, D.C., 47 F.Supp. 206.
As was stated by the Court in Queensboro Farm Products, Inc. v. Wickard, 2 Cir., 137 F.2d 969, 974 (affirming Queensboro Farm Products, Inc. v. Wickard, supra), we should approach a determination of the questions presented, with certain important background facts in mind.
"The Act was originally enacted in 1933 and was amended in 1935 and again in 1937, 7 U.S.C.A. § 601 et seq. Its original provisions relating to milk were the result of nation-wide distress of milk farmers, a distress which had culminated in a milk farmers' `strike'  accompanied by violence and constituting an incipient agrarian revolution  that threatened to cut off a vital part of the nation's food supply. Experience before and since the passage of that legislation has disclosed that the `milk problem' is exquisitely complicated. * * * The difficulties described as `the milk problem' revolve in some considerable measure about the complex relations between the farmers and the `handlers' who buy the milk from the farmers and sell it, in fluid or altered form, directly or indirectly through others, to the ultimate consumers. * * * The difficulties have given rise to much legislation and are reflected in many judicial decisions. The pressure of milk is indeed powerful. A milk flood washed away the foundations of what seemed the firmly entrenched constitutional doctrine that the legislature could regulate only business `affected with a public interest'[7]; and the lactic tides have eroded another constitutional doctrine which more recently appeared to have been strongly established (i.e., that only within very narrow limits can Congress delegate `legislative' powers), showing that what oil and chickens could not do milk could.[8] The milk problem is so vast that fully to comprehend it would require an almost universal knowledge ranging from geology, biology, chemistry and medicine to the niceties of the legislative, judicial and administrative processes of government. It affects an industry immense in scope, for dairying is said to be the largest single branch of agriculture in this country with the exception of that of raising livestock for slaughter, the annual money value of dairy products running to billions of dollars."
The constitutionality of the Act has been sustained by decisions of a Court binding on this Court. We proceed to a consideration of plaintiffs' assignments under the applicable rules of law as we interpret them.
The burden of showing the illegality of the administrative order is upon the plaintiff. Borden's Farm Products v. Baldwin, 293 U.S. 194, 209, 55 S.Ct. 187, 79 L. Ed. 281, 288; United States v. Rock Royal Co-operative, Inc., 307 U.S. 533, 567, 59 S.Ct. 993, 83 L.Ed. 1446, 1467.
Section 903.3 (e) of the amended order is alleged to be illegal and in violation of Section 608c (5) of the statute, in that it is claimed this section of the order requires the payment for producers' milk to be made at Class One price regardless of actual use, whenever the handler either imports or sells ungraded milk in the area. Section 608c (5) of the Agricultural Marketing Agreement Act directs that marketing orders shall classify milk "in accordance with the form in which or the purpose for which it is used" and fix "minimum prices for each such use classification."
Plaintiffs' complaint under this heading results from a misconstruction of the amended order. The order classifies producers' milk in two classes, based upon use, namely, Class One includes all milk the *218 "utilization of which is not established as Class Two milk." Class Two milk is all milk used or disposed of "in any form other than as milk. * * *" The order fixes a minimum price for each class. Section 903.3 (e) of the order is a formula or method to carry into effect the classification of milk according to use and minimum price provisions fixed by the order. Without such provision, both the classification and minimum price provision of the order would fail in their purpose in many instances, under the method of operation of many handlers in the area as shown by the record. The object of the Agricultural Marketing Agreement Act of 1937 is to stabilize the marketing of milk in such manner as to assure adequate prices to producers; that is, prices which will reflect the price of feeds, the available supply of feeds, and other economic conditions which affect market supply and demand for milk or its products in the marketing area covered by the marketing agreement or amendments thereto, and which will insure a sufficient quantity of pure and wholesome milk and be in the public interest. 7 U.S.C.A., § 608c (18). There was a finding by the War Food Administrator "that the issuance of this order, as amended, and all the terms and conditions of the order, as so amended, tend to effectuate the declared policy of the Act." The test whether the War Food Administrator has acted within the limits of the Act is that the classification be according to use, and the price fixed result in payments to producers for their milk which are uniform as to all handlers and are such as the War Food Administrator determines meet the other requirements set forth in Section 608c (18) of the Act, and that his finding be based upon substantial evidence. In fixing the price to be paid producers and classifying milk according to use, if found necessary, the War Food Administrator may eliminate from computation all milk except that of producers for the prices to be paid are those to be paid for producers' milk, not those for imported milk or ungraded milk.
The record discloses that except for a short period in the year 1943, the production of milk by producers in the area has exceeded the Class One Milk requirements of the area. Class One and Class Two sales of milk by handlers of the St. Louis area have at times exceeded the total production of producers in the St. Louis area. For some years past, some of the plaintiffs have imported milk outside of the area from Chicago dealers, especially during the period of short production in the St. Louis area. Prior to the amendment of the marketing agreement which was effective January 1, 1944, those plaintiffs who imported milk, mixed the imported milk with the local producers' milk (which was in accord with the order then effective) and paid to local producers a blend price, based upon a percentage, according to the use of the blended milk for Class One and Class Two purposes. Under the provisions of Section 903.3 (e) of the amended order, handlers are required to allocate producers' milk to Class One usage up to 95% of the handlers' actual Class One use, prior to the allocation of other milk (imported or ungraded) to such use. To illustrate the effect of the amended order, in this respect, assume a handler received one hundred pounds of milk from producers in the area under the marketing agreement, and the same handler receives one hundred pounds of milk, either ungraded or imported from a Chicago dealer, and of the two hundred pounds thus represented, uses one hundred fifty pounds for his Class One use and fifty pounds in Class Two use. Prior to the amended order, plaintiffs (who imported milk or used ungraded milk) would have paid producers for their milk on a pro rata basis; that is, the percentage of producers' milk considered as used in Class One was the percentage of the handlers' total receipts (both producers' and imported or ungraded milk) used in Class One. Under the assumed figures, since three-fourths of the blended milk was used in Class One, three-fourths of one hundred pounds, or seventy-five pounds, would be allocated to the local producers as Class One Milk, and paid for at Class One Price, and the balance, or twenty-five pounds, would be paid for at Class Two price. Under the order as amended, at least ninty-five pounds of local producers' milk would be considered as used for Class One purposes. If the plaintiffs continue to import milk, in the same manner and extent as prior to the effective date of the amended order,[9] the effect of the formula in the classification provision of the amended order will be to raise the percentage of local producers' milk used or considered as used in Class One, as compared *219 with the percentage used or considered as used in Class One prior to the effective date of the order, and thus increase the price to producers delivering milk to such importing handler as a result of milk classification. The plaintiffs' criticism of the amended order as "requiring the compensation of local producers' milk in Class One price regardless of actual usage, whenever the handler either imports or sells ungraded milk in the area," is not sustained by the record. The amended order does not require the payment of Class One price for any producers' milk that is not or cannot be used for Class One purposes by the handler. The handler may choose to import milk and blend it with producers' milk and use part of the blend for Class One and part for Class Two usage, but this practice of handlers should not be the basis of penalizing the producer and classifying his milk as Class Two and paying therefor in that class, when the handler had Class One uses for the milk, if the Administrator finds that such practice destroys stabilization, is contrary to the purposes of the Act, or results in rendering inoperative orders made under and in conformity with the Act. There was no evidence at the hearing, and we do not understand the plaintiffs to so claim, that in the case of the handler importing milk, such imported milk and producers' milk is kept separate. The record is that they are inextricably intermingled. Therefore, it would appear that the administrator had no choice under these circumstances if the order was to carry into effect the purpose of the act and to establish a formula and means of handling milk that would make effective the classification and minimum price provisions of the order. It is not the purpose of the order to put a minimum price on imported milk or ungraded milk.
The question under plaintiffs' present contention is whether the War Food Administrator has authority under the Act, in order to make effective classification and minimum price provision of the order and to provide for stabilization and uniformity of payment, both by handlers and to producers, to require the utilization of local producers' milk for Class One purposes prior to the use of imported milk or ungraded milk for such purpose, where the War Food Administrator has deemed such action necessary to effectuate the declared policy of the Act. We are unable to find anything arbitrary or capricious in such action, or that the Act is violated by such character of order under the circumstances here presented. Certainly it would tend to discourage the production of milk by local producers if handlers are permitted to place their milk in Class Two and pay for it accordingly when they have Class One uses available and fill those uses by imported milk, thereby compelling local producers to carry some of the transportation charges of the imported milk. In the case of United States v. Rock Royal Co-op., 307 U.S. 533 loc. cit. 567, 59 S.Ct. 993, 1010, 83 L.Ed. 1446, the Supreme Court had before it for review the legality of the Marketing Agreement Act, and an order issued under it, regulating the handling of milk in the New York Metropolitan area. Provision was made by the order for special differentials of 20% on milk from certain areas located most favorably to the marketing area. The District Court held the differentials unfair as to defendants who had no patrons subject to the differential. In reversing the lower court, the Supreme Court held:
"This payment tends to stimulate production. Larger production means more benefit from the freight advantage to competitors. The discrimination seems fanciful and remote. It would not justify a court in overturning the Secretary's determination of the propriety of the differentials on evidence found by the lower court to be substantial. Such an administrative determination carries a presumption of the existence of a state of facts justifying the action far too strong to be overturned by such suggestions as are made here." (Emphasis added)
Further exception is taken to Section 903.3 (e) of the amended order, charging that it violates Section 608c (5) (A) of the statute which requires that the prices fixed by marketing order shall be uniform in the area as to all handlers. The basis of plaintiff's complaint in this regard, as stated by plaintiffs, is that under Section 903.3 (e) a handler who imports milk "must pay Class One price for at least 95% of milk" purchased from local producers regardless of the purpose for which the milk is used, while handlers who do not import milk pay producers for their milk either Class One or Class Two price, according to the actual use made of the milk.
As we observed above, absent the amendment effective January 1, 1944, producers delivering milk to import handlers were *220 at the mercy of the handlers, as to the Class in which their products would be considered. Under the previous order, a producer who delivers his milk to a non-importing handler has his product classed and paid for according to its use. On the other hand, if a producer delivered to an import handler, he had his milk classified on a fictitious basis, a percentage basis of imported and producers' milk  the class under which the producers' milk was paid for varying, not according to its use, but according to the amount of milk imported and mixed with the producers' milk. It appears to the Court that the producers were in a much better position to complain of a discrimination and lack of uniformity in price under the old order, than the handlers are under the new order. The effect of the amended order is to declare to the importing handler, when he receives producers' milk, "If you have Class One uses for fluid milk, then to the extent of 95% of such use, such producers' milk will be so used, but if you elect to devote it to a cheaper use, it will still be classed as fluid milk." There can be no basis for a claim from the handler that he could not use the milk in that class. Only to the extent that he has such uses available is it so classified. If the handler chooses to divert the producers' milk to Class Two uses, and use instead imported or ungraded milk for his Class One use, that is a decision resting solely with the handler. The importing handler, like the non-importing handler, fills his Class One uses with producers' milk to the extent available and pays for it accordingly. Instead of being subject to the charge of lack of uniformity as between handlers, the amended order promotes such uniformity. In the case of Waddington Milk Co. v. Wickard, 2 Cir., 140 F.2d 97, 101, the Court of Appeals for the Second Circuit had before it an order which, for the purpose of classifying milk for wholesale prices, used "the time when it leaves the initial receiving plant of the distributor." Here the Secretary takes the uses available, in the case of the importing handler, prior to the mixing of the producers' milk and imported milk, as the yardstick or formula for fixing classification of the milk. In approving the formula in the Waddington Milk Co. case, the Court said:
"It therefore seemed desirable that certain differentiations based on the manner of utilization of the milk should be made. But there were obvious difficulties in making the ultimate consumer's utilization the test. Not the least of these was the fact that here was an Agricultural Adjustment Act, or frankly a regulative measure to improve marketing conditions not for the consumer, but for the producers, as the declaration of conditions, 7 U.S.C.A., § 601, stated; it was the impairment of `the purchasing power of farmers' and the destruction of the value of `agricultural assets which support the national credit structure' towards which the legislative attention was directed. But the producer had little direct interest in or control over the ultimate utilization of the milk and might well be prejudiced if his recompense were made to depend upon that utilization. Given the conditions and the purpose, there appears to be nothing unreasonable in selecting as the controlling point for determination of the form in which milk is to be classified for the fixing of wholesale prices the time when it leaves the initial receiving plant of the distributor."
To hold that the Administrator could not recognize this situation caused by importers of milk, as described, as one tending to destroy market stabilization, and take steps to correct it, would be to defeat the declared purpose and basis of the order. Quoting further from the Waddington case in this connection, the Court said:
"After all, it is the function of the Secretary, not of the courts, to devise a fair system of fixing marketing costs. Here he acted only after the most extensive hearings and consideration of the interests of all parties with the referendum required by the Act, United States v. Rock Royal Coop., supra * * *; and the later history of the order shows that it has been under constant supervision and examination since its adoption. The order is complicated and detailed; certainly it appears more likely to achieve fairness in the greater number of cases than any we can think of or suggest. We are clear that it results in no unfair discrimination among handlers here. Indeed to an unusual degree, considering the complications of the industry, equality of opportunity to operate and of operation is preserved by it."
Under the order, if a handler's Class One sales run close to his total producers' milk, that is, 95% of it, and a handler imports milk to make up the deficit in Class One requirements, the handler may import milk and pay his producers on the basis of 95% *221 of their milk at Class One price and the balance at Class Two price. The handler may import milk at any time. If his Class One uses are not sufficient to take the supply of producers' milk, he would pay only Class One prices for the milk used, and Class Two prices for the balance. He may reduce his producers' price only when his Class One uses exceed 95% of the producers' milk received by him.
The order is uniform in its application as to all handlers. All handlers pay Class One prices to the producers for milk for which they have Class One uses. Thereafter all handlers pay Class Two prices for milk devoted to such purpose and an importing handler can not destroy the uniformity of operation. The exception covering the case of importing handlers is uniform as to all importing handlers. Thus, the order is uniform as to all handlers under like circumstances. This we understand to be the test, that the order shall come within the power delegated under the Act. Nicol v. Ames, 173 U.S. 509, 19 S.Ct. 522, 43 L.Ed. 786, Midwest Mutual Ins. Ass'n v. De Holt, 208 Iowa 49, 222 N.W. 548.
Objection is made to Section 903.3 (e) of the amended order as being in conflict with Section 608c (5) (G) of the Act, which denies to the Secretary the making of a marketing agreement or order which prohibits or in any manner limits, in the case of the products of milk, the marketing in the area covered by the marketing agreement or order, of any milk or products thereof produced in any production area in the United States.
The amended order does not prohibit the marketing of imported milk in the St. Louis area, nor does it limit the marketing of milk products in the St. Louis area. The order does limit the marketing of imported milk in the St. Louis area. If the statute must be construed to prohibit a marketing agreement or order, limiting the marketing of imported milk in the area covered by the order, under any circumstances, whether necessary to make the Act and orders under it effective or not, then the order in this case must be held invalid for that reason.
The Secretary has interpreted subsection (G) of the Act as providing that no agreement or order shall prohibit the marketing of import milk into the area covered by the order, but that a marketing agreement or order may, if necessary to effect the purpose of the Act, limit the marketing of imported milk; that the term "limit" used in the Act refers to the marketing of "milk products." The Departmental interpretation is entitled to some weight. In United States v. American Trucking Associations, 1939, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345, the Supreme Court announced the rule with regard to interpretation of statutes by the Administrator charged with administering the Act. The Wage and Hour law was under consideration. The Court said (310 U.S. loc. cit. 549, 60 S.Ct. 1067, 84 L.Ed. 1345):
"In any case such interpretations are entitled to great weight. This is peculiarly true here where the interpretations involve `contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new.'"
The statute, like the amended order, is not without its complications, yet we believe its terms to be plain on the question here presented. Note the language of the statute, and particularly the part italicized.
"No marketing agreement or order applicable to milk and its products in any marketing area shall prohibit or in any manner limit, in the case of the products of milk, the marketing in that area of any milk or product thereof produced in any production area in the United States."
Unless the statute is interpreted to mean that the language "or in any manner limit" refers to milk products, then the language "in the case of the products of milk" is without meaning and might as well have been left out of the Act. If possible, an interpretation should be given to the Act which gives meaning to all the terms included in the Act. See Jones v. York County, Neb., 8 Cir., 1931, 47 F.2d 837, where the Court ruled (loc. cit. 839):
"Not only should the act be given effect as a whole, but effect should be given to each of its expressed provisions, and hence all the language of the act must be considered. It is a recognized rule of construction or interpretation that the legislative intent is to be deduced from a view of the whole and every part of the statute taken and compared together, and, if possible, this act should be so construed as to render it a consistent and harmonious whole, and that construction should be favored *222 which will render every provision operative, rather than one which would make some of its provisions idle or nugatory."
There is no claim that the amended order "in any manner limits" the marketing in the St. Louis area of "the products of milk" produced in other production areas in the United States. On the contrary, the effect of the amended order is to encourage the marketing in the St. Louis area of milk products produced in other areas by "limiting" and not "prohibiting" the importation of fluid milk for fluid milk purposes. That the interpretation placed upon subsection (G) by this Court was the interpretation intended by Congress is indicated by the statement before the House at the time the Act was being considered. The fear on the part of Representatives from states exporting milk products prompted the limitation provision. Manifestly it cannot be economically sound to transport fluid milk from one area to another, or, as in the case before the Court, from one area where there is a shortage of fluid milk to another area. We doubt that the dairy interests of Minnesota or New York had any thought of sending their fluid milk to the St. Louis area, there to compete with the fluid milk produced in the St. Louis area  it was the milk products of these milk producing areas which were uppermost in the minds of their Representatives and prompted the writing of the restrictions into the law. When this provision came from the conference, the managers for the House reported, page 21:
"Under the House bill no marketing agreement or order applicable to milk and its products in any marketing area could prohibit the marketing in that area of any milk or product thereof produced in any production area in the United States. The Senate amendment extended this provision so that no marketing agreement or order so applicable could limit in any manner the marketing in the marketing area of milk or its products produced anywhere except that certain limitations on the marketing of milk were specifically permitted. The conference agreement retains the House provision with respect to prohibitions on the marketing of both milk and products of milk. The conference agreement also denies the authority to limit in any manner the marketing in any area of milk products (butter, cheese, cream, etc.) produced anywhere in the United States. The language adopted by the conference agreement does not refer to milk, and so does not negative the applicability to milk, for use in fluid form or for manufacturing purposes, of the provisions of the bill relating to milk, such as the provisions on price fixing, price adjustment, payments for milk, etc."
While it cannot be said that in passing the law on which the milk agreements are based, Congress had in mind the limitation on importing milk which results from the method or formula used to make the classification effective under the amended order, yet it does appear from the proceedings before the House which counsel for the plaintiffs have supplied the Court, that certain restrictions were contemplated, in connection with classification and price fixing under the Act. We quote from the statement of the Chairman of the Agriculture Committee:
"In order to get away from the terrific conditions that have prevailed in the milk industry there is provided in the bill authority to fix a minimum price to producers. That, at least in a measure, would limit or tend to limit shipment * * * Then it is a universal custom in the marketing of milk to classify milk. This, in a way, is a limitation."
That limitation on importation of milk now under consideration is in harmony with the Act plainly appears from a further observation of Mr. Jones before the House:
"That simply applies to fluid milk. You cannot make any limitation at all on the amount of butter or cheese or milk products that are shipped from any one area to another, and the limitation that may be applied on milk is only such limitation as puts each area on an equality with the other areas."
It does not put the producers of the St. Louis area on the same basis as the producers of the Chicago area to have milk imported from that area and used to displace local producers' milk from Class One to Class Two or the lower price class. This Court does not know what the milk orders are in other areas. We think it fair to assume that since the same agency of the Government is administering all areas that an effort is being made so far as humanly possible to put all areas on the same basis with each other. Exact equality of all producers in each area may not be possible, but we have not been informed of a plan that will promote greater equality among *223 them than that contained in the amended order. If that portion of the order under consideration is made applicable for all areas throughout the United States where imported milk forces down the price of local producers' milk, it will result in producers and handlers in each area being put on substantial equality; it results in all local producers of each area having their milk placed in Class One up to 95% of their handlers' uses. If the Class One use requirements of a handler cannot be supplied by the local producers' delivery to him, then each handler is at liberty to import milk or sell ungraded milk for his Class One uses. To show the lack of equality as between producers in different areas in the operation of import handlers prior to the amended order going into effect, take the example above referred to where a handler receives one hundred pounds of milk from local producers, and receives one hundred pounds either ungraded or imported milk, and of the blended two hundred pounds of milk, disposes of 150 pounds in Class One uses and fifty pounds in Class Two uses. Of the delivery of the local producer of one hundred pounds, the local producer receives payment for only seventy-five pounds as Class One, and the other twenty-five pounds he is paid for on a Class Two basis. The entire one hundred pounds of imported or ungraded milk going into the blend may be (and according to some of the testimony was) paid for to the producer of the area from which the milk was imported at Class One price. We doubt very much if such imported milk is delayed in classification until the handler in the St. Louis area decides what percentage of the blend with local producers' milk will be used in each Class. Thus it is possible and probable that the producer in the area from which the hundred pounds of milk was imported will have his entire hundred pounds of milk put in Class One while the local producer has only a percentage or 75% of his milk put in Class One. The plaintiffs state only half the proposition when they argue, "Thus the importation of milk upon an equality with locally produced milk was the basis upon which the Act, with or without Section 8c (5) (G) was interpreted, explained, and adopted." Locally produced milk should, in like manner, as far as possible, be placed upon a basis of equality with the classification of imported milk, insofar as the producer thereof is concerned.
Plaintiffs assert that Section 903.3 (e) of the amended order violates Article I, Section 8 of the Constitution, requiring uniformity of imposts, and Article I, Section 9, which provides that no preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another. It is plaintiffs' position that these constitutional provisions prohibit the limitations resulting from the operation of Section 903.3 (e) of the order as a discriminatory burden upon out of state milk, and that the Act must be construed to conform to the constitutional provisions referred to; that the amended order constitutes a trade barrier of a character prohibited by Federal as well as State organic law.
The amended order makes no charge, of any kind, upon milk brought into the area from other areas. The price import handlers pay for imported milk is a matter of contract between the import handlers and those from whom they make the purchases. A handler may import all the milk he desires, but he cannot use it in a class that results in reducing the classification of local producers' milk and destroys the effects of marketing orders under the Act. We see no application of the provisions of the Constitution cited by the plaintiff to the question now before the Court. Article 1, Section 9, of the Constitution, which provides that no preference shall be given to the ports of one state over those of another, has no application, because no preference is given to the ports of one state over those of another. The local producers covered by the marketing agreement are largely Illinois producers, and one of the purposes of the amended order is to maintain and increase the flow of milk into the St. Louis area, mainly from Illinois producers. It is these producers whose production is discouraged by permitting imported milk to displace their milk in Class One. The reduction of such production may reduce the flow of such milk in interstate commerce. The War Food Administrator has found that the regulation is in the public interest. The only discouragement to the importation of milk which may result from the amended order will come about from the price which importing handlers may have to pay for imported milk, and which price may make it unprofitable to use such milk as Class Two, but this price is not fixed by the order and remains a matter of agreement between importing handlers and out *224 of area milk suppliers. To absorb transportation costs, import handlers desire to put imported milk in Class One uses as far as possible, and thereby displace local producers' milk, with the result that producers' milk goes into Class Two at a lower cost to the handler. If the operation of the importing handlers as conducted prior to January 1, 1944, were to continue, the only way consequent injury to the local producers could be remedied, would be by raising the price of Class One and Class Two milk to a point where it would be a burden on consumers and non-importing handlers. The record shows that importing handlers secure their imported milk from the Chicago area, an area with a milk shortage equal to if not greater than the St. Louis area. To raise prices to be paid to the local producers to meet a problem thus created by the importing handlers, importing milk from such source, and paying cost of transportation of such milk to St. Louis, would in itself seem to raise a serious question of public interest affected thereby and Plaintiffs cannot torture the doctrine which condemns erection of trade barriers by federal authorities into justifying the practice followed by them prior to the promulgation of the amended order. No importer of milk into the St. Louis area pays any tax that results from any provision of the amended order, and no local producer receives any premium from any import handler from the importation of milk. Plaintiffs claim that the order creates a trade barrier and lays discriminatory burdens upon out of state milk. Considering this position in the abstract, persons who might be affected thereby are not here objecting to the order. In the case of Queensboro Farm Products v. Wickard, supra, the Court said (137 F.2d loc. cit. 977, 978, 979):
"For, so far as appellant is concerned, the issue of their validity is hypothetical. `Vicarious complaints will not serve.' A person cannot ordinarily raise a question as to the validity of aspects of official action which do not adversely affect his own legally protected interests. That doctrine is well settled `notwithstanding the seeming logic of the position' that, if the official action is invalid as against any persons affected by it, `it is void as to all'; accordingly the Supreme Court, having held a statute unconstitutional as applied to one person on a certain state of facts, has subsequently held the same statute constitutional as applied to another person on another state of facts. That doctrine is but one phase of the Supreme Court's long-established policy of unwillingness to worry about how to cross bridges it has not yet reached. That reluctance has been manifested in its refusal to consider hypothetical questions relating not only to the constitutionality of statutes but also to variety of other issues including  notably for our present purposes  the issue of whether an administrative officer has acted in violation of a valid statute. Consequently, the possible injury to others than appellant which might result from the Secretary's order is a matter we shall not consider. * * * Congress did not accord to persons seeking a review under this Act the right to vindicate the public interest, did not constitute them `private Attorney Generals.'"
Plaintiffs assail the order and particularly Section 903.3(e) as being contrary to the protection of the public interest section of the Act. Plaintiffs claim, as a basis for this contention, that producers stand to gain by underproducing and thereby forcing the importation of milk or use of ungraded milk in the area, with the result that all of producers' milk will fall into Class One use.
There attaches to the amended order a presumption of the existence of facts justifying the specific exercise of the authority delegated to the Secretary. The objection of the plaintiffs to the order on the ground that it will tend to cause under-production finds no basis, in our opinion, on the record in this case. The objection goes rather to the judgment exercised by the Secretary than to a question of law on the legality of the order. Unless the order in the respect complained of has no reasonable relation to the objectives set forth in the Act, or unless it is otherwise shown to be arbitrary, "the plaintiffs have assumed the heavy burden of overcoming the presumption * * *." Thompson v. Consolidated Gas, 300 U.S. 55, loc.cit. 70, 57 S.Ct. 364, 371, 81 L.Ed. 510. The order became effective January 1, 1944. There was a hearing held on March 27, 1944, and a further hearing on August 11, 1944. At neither of these hearings, subsequent to the effective date of the order, was any showing made or attempt made to show that the production of milk in the St. Louis area had been reduced as a result of the order, and particularly Section 903.3(e) of the order. This Court is not in a position, in the face of such record, to presume on the basis of the bald assertion of plaintiffs, *225 that the order will tend to decrease production.
Plaintiffs except to the failure of the amended order to provide for classification and price of imported milk and ungraded milk. The Act does not provide for minimum price fixing on such milk. The purpose of the Act and the authority therein granted to the Secretary to fix minimum prices for milk is to secure an adequate price to the "producer" and an adequate supply of milk for the consumer. Since plaintiffs are at liberty to use imported and ungraded milk as they decide is to their interest only and to purchase imported and ungraded milk at a price, without a fixed minimum, we are unable to see how plaintiffs have any real basis for complaint in this respect or that it has any merit.
Plaintiffs object to the provision of the order which places on the handler the burden to prove the use which was made of milk received from producers. Section 903.3(a) of the amended order provides that "the burden rests upon (1) the handler * * * to prove to the market administrator that such milk should not be classified as Class One milk; * * *" Subsection (b) of the same section defines the two classes of milk.
The order requires the handler to make reports to the market administrator showing the milk handled and the classes in which it was used, under the terms of the order. All milk is placed in Class One by the market administrator unless proof be furnished by the handler of its use in Class Two. Any arbitrary action of the Market Administrator in rejecting proof of proper classification is reviewable. A similar provision in a milk order was approved in United States v. Ridgeland Creamery Co., D.C., 47 F.Supp. 145, loc.cit. 149. The provision as to burden of proof appears to this Court a reasonable and fair method of determining classification of milk. The handler is in possession of all facts and records upon which knowledge as to the use of milk and the grades in which it should be placed, must be based. Why shouldn't the burden be placed in such hands, so that upon the basis of facts showing the use of milk, the handler can furnish the evidence reasonably necessary to the market administrator? Under such circumstances, it certainly would be an unusual and awkward regulation to place the burden upon the market administrator. Such a provision in the marketing order is a part of the method prescribed by the Administrator for the classification of milk, and we find nothing in its terms contrary to the act. The fact that no such requirement is imposed as to imported milk is immaterial, since the order neither classifies nor places a minimum price on imported milk.
Plaintiffs allege that the amended order is invalid because it contravenes the Stabilization Act of 1942 and executive orders made thereunder. The law known as the Stabilization Act of 1942, 56 Stat. 765, 50 U.S.C.A. Appendix § 961 et seq., directs the President to stabilize prices on the basis of levels that existed on September 15, 1942, subject to exceptions. Adjustments were authorized under the Act, with respect to prices, a change in which is found necessary in connection with the prosecution of the war or to correct gross inequalities.
The Stabilization Act provides that maximum prices on agricultural commodities shall not fall below certain levels and that modifications in prices for agricultural commodities may be made where the maximum prices do not reflect increased cost to producers since July 1, 1941. By Executive Order No. 9250, 50 U.S.C.A. Appendix § 901 note, the President delegated to the Economic Stabilization Director certain authority under the Act, and by Executive Order No. 9328, 50 U.S.C.A. Appendix § 901 note, a further delegation of authority to the Economic Stabilization Director was made, including the power to take such action as he deemed necessary to maintain and increase production. The Economic Stabilization Director, acting under the executive orders referred to, approved the amended order to the St. Louis marketing agreement prior to its effective date. We have not been directed to any portion of the record as a basis for a claim that the Economic Stabilization Director acted arbitrarily or capriciously in approving the order. Aside from the fact that the Economic Stabilization Director would have authority to increase prices to producers under certain circumstances, we find little basis for a claim that prices have been increased under the minimum prices set in the amended order as compared with the previous order. In the report filed on the 13th day of October, 1943, the Acting Director of War Food Distribution concluded that no price changes *226 should be made at this time, and the amended order is based upon that conclusion. True, the producers sought a general and substantial increase in Class prices, but this was not granted. The increases resulting from the amended order were very slight and with minor exceptions the increase to producers was due to the increase in producers' milk going into Class One utilization by virtue of the order providing for its preference in that class where such use was available prior to the use of imported milk for Class One purposes. As to those handlers that are required to pay an increase in price for milk as a result of the amended order, the increase is not substantial.[10] Exhibits 19 and 20 show that for the months of January and February, 1944, subsequent to the effective date of the amended order, many of the handlers paid in excess of the minimum prices, such excesses ranging in price as much as thirteen cents per hundred weight in January and ten cents per hundred weight in February. It would appear, therefore, that competitive conditions caused some of the handlers to pay more than the minimum price as provided in the amended order. The amended order is not in violation of the Stabilization Act of 1942.
We pass to plaintiffs' objections based upon alleged failure of the Administrator to comply with procedural requirements of the law leading up to the issuance of the amended order. The first three procedural objections charge that the record fails to support the amended order with regard to (A) classification of milk under Section 903.3 of the amended order, (B) change in butter fat differential provided in Section 903.8(b) of the amended order and (C) price increases generally alleged to be effected by the amended order.
In passing upon objections of the character here presented, this Court may not weigh the evidence and substitute its independent finding for that of the administrator. Clark v. Portland General Electric, 9 Cir., 111 F.2d 703. No authority is needed to support the proposition that the administrator's findings, if supported by substantial evidence before him, should not be disturbed by this Court, even though upon a consideration of all the evidence, this Court might reach a different conclusion. The Agricultural Marketing Agreement Act and agreements and orders made thereunder are not only designed to establish prices to farmers or producers at a level which will give agricultural commodities a purchasing power equal to that prevailing in a certain base period, but the orders are intended to make prices so established effective. Such orders can be of no force if practices of handlers are permitted to render them inoperative in fact. That the practice of handlers in importing milk and mixing it with producers' milk and classifying producers' milk on a percentage basis, resulted in reducing the price of milk to producers contrary to the purpose of the marketing agreement appears amply sustained from the record if any record is needed to sustain such a self-evident conclusion. At the hearing held on the proposal to amend existing milk order, September 3, 1943, A. D. Lynch, Secretary-Manager of the Sanitary Milk Producers, gave testimony, including the following:
"Sanitary Milk Producers has requested that provisions be made for crediting all Class One sales to local St. Louis producers, as defined in the order, prior to allowing receipts from other sources to be accounted for as Class One.
"A report computed by the Market Administrator's Office entitled `Reported Pounds of Approved Milk Purchased by St. Louis Handlers From Sources Outside the St. Louis Supply Area, 1941-1943.' and already in the record shows by months for *227 1941 up to date the extra dollars that local St. Louis producers would have received had they not been compelled to have their milk pooled with importations from the outside.
"In July, 1943, the loss to St. Louis producers amounted to $25,622.04. In July a year ago the amount was $20,082.97, while in July, 1941, it was $7,499.00. This sum is increasing at a rapid rate and there is no justifiable reason why St. Louis producers should be credited with Class Two sales when outside importations are made."
In the hearing held on March 27, 28, 1944, to consider the petition filed by plaintiffs under Section 8c(15) (A) of the Act, excepting to the proposed order, Joseph B. Winkler was called as a witness by the plaintiffs. Mr. Winkler is Manager of the Valley Farms Dairy, one of the plaintiffs. As to the effect of importing handlers diverting local producers' milk to Class Two use in order that imported milk might be utilized in Class One, and its effect upon local producers and the price that they are paid for their milk, Mr. Winkler testified:
"We made a deal with Pevely Dairy we could contract for 3,000 pounds of milk a day from June until December 31st of imported milk. That was earmarked for us.
"Q. At what class price was that billed to you? A. Class I price, plus the handling at Chicago, plus transportation, plus the handling charge at St. Louis.
"Q. Now, what effect did the billing to you at Class I price have upon the price that you paid to your local producers? A. Well, it just cut my local producers out of that percentage of Class I milk I bought from them and lowered my price accordingly."
There is evidence in the record to the effect that the importing handlers' practice now under consideration tended to discourage production of milk by local producers. Certainly it could not be expected to encourage production in the St. Louis area. On this subject, Mr. Lynch testified:
"Q. Now, one of your proposals is to allocate all the producer milk to Class I before any milk can be paid for at the Class II price? A. Yes.
"Q. What is the purpose of that? A. We feel it is discriminatory to local producers to have a situation whereby any of their milk is accounted for as Class II, when outside milk is shipped in and is shared and shared alike with local producers. We think that over a period of time that this would tend to discourage any increase in local production and is taking dollars that we feel are earned by local producers and sending them out to other areas. We think it is a bad economic policy to have that go on."
Again testifying on the same subject, Mr. Lynch stated:
"Q. Whether or not the Chicago milk might be considered as emergency milk, do you feel that there is still some justification for allocating the milk of local producers to Class I first from the purely economic standpoint that it is more efficient marketing? A. Yes.
"Q. Is that your point? A. And to encourage the nearby milk to come to this market and we should go to Wisconsin and get our by-products and get our regular nearby milk of local farmers, lower costs and nearby milk is fresher when it finally is sold to the consumer."
On the subject of butter fat differential, under the amended order, to urge there is no evidence on this subject in the record, or no evidence upon which the order in that respect can be based, is to ignore many pages of the record made at the promulgation hearing. To cite one example, we quote from the testimony of Mr. Fulton, a producer of milk in the St. Louis area:
Mr. Fulton: "I am a producer of inspected milk with a high butter fat content, and the present price for the butter fat differential is 4½% per point. If I were to sell my milk to a condensery without having any inspection, I would receive 7½¢ per point for the first five points above three and one-half per cent and 5¢ per point up to the test of milk that I delivered. Our test will run on an average of about 5.2%, and on that basis we would have a premium over the 3½% milk of 97½¢ for the 5.2% milk. The milk that we are selling now at 4½% would be worth a premium of 76½¢."
Mr. Lynch: "How much difference is there in favor of the condensery market in your case?"
Mr. Fulton: "That would be about 21¢ more for condensery milk than we are receiving for our inspected milk."
*228 Mr. Lynch: "As far as the fat differential is concerned?"
Mr. Fulton: "Yes."[11]
What we have heretofore said as regards alleged increase in price granted to producers by the amended order covers plaintiffs' complaint in this regard under their procedural objections.
There are many decisions in the appellate courts on appeals for review of milk orders and construction of orders of the Secretary of Agriculture under the Act. We think it can be fairly said that without exception in passing upon such matters, the courts have given serious consideration to the complexities of administering the Agricultural Marketing Agreement Act. The decided cases express recognition of the intention of Congress to give to the Secretary, and under present administration, the War Food Administrator, wide discretion in devising regional marketing plans, classifications under the Act, and formulas for making such classifications effective. The courts are cautioned to be slow to intrude on the Administrator's exercise of the discretion placed in him under the Act. Manifestly, one of the reasons for this is the inability of the Courts to undertake competently the task of devising and thereafter regulating milk marketing programs under the Act. When one reads the amended order or marketing agreement involved in this case, the technical language in which it is couched, and testimony in the record of the same character, the wisdom of this policy becomes manifest, as was said by the Court, in the Queensboro Farm Products case, supra (2 Cir., 137 F.2d 969, loc.cit. 980):
"If ever there was a place for that doctrine, it is, as to milk, in connection with administration of this Act because of its background and legislative history."
See also Gray v. Powell, 314 U.S. 402, 62 S.Ct. 326, 86 L.Ed. 301; United States v. American Trucking Associations, 310 U. S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345.
Plaintiffs charge error in the administration procedure by refusal of certain evidence offered by plaintiffs to show (A) the extent of price increases effected by the amendments; (B) the butter fat differential violates the use classification required by the Act; and (C) the price increases resulting from the amended order are confiscatory.
The charge that the butter fat differential provided for in the amended order violates the use classification required by the statute is answered by the absence of a butter fat classification in the amended order. The Act provides that price shall be subject to adjustment for grades or quality of milk purchased by handlers from producers. Butter fat content of milk is considered in determining the price to be paid producers for their milk.
Plaintiffs complain because they were not permitted at the 15-A hearing on their petition excepting to the amended order, to show the "extent of price increases" under the amended order. The announced purpose of the amended order was not to grant any "class price changes." None were granted. If the effect of the amended order was nevertheless to grant general increase in prices, we think plaintiffs should have been permitted to show that  but at which hearing? The notice of hearing (dated August 27, 1943) gave plaintiffs detailed notice of the change proposed in the order and upon which the promulgation hearing was about to be held. The changes made by the amended order and now complained of by plaintiffs were in effect set out in the notice. We think the place for plaintiffs to have offered this testimony, if they had any, on the effect of such change on increasing prices, was at the promulgation hearing. They did not do so. Plaintiffs offer no explanation for their failure to do so.
On the claim of "confiscation," "because of officially imposed ceiling prices at or below which their milk and products are required by law to be sold and the price increases imposed by the amendments * * * do not permit any reasonable margin of operation," evidence on this position of plaintiffs had no part in this case because, even if plaintiffs had shown they were entitled to an increase in selling price, the administrator could not have granted relief. The problem before the administrator was the necessity and legality of the order to carry out the purpose of the Marketing Agreement Act  increase in selling prices for handlers is not *229 one of them. That is a matter which by law has been placed under the jurisdiction of the Office of Price Administration.
In the case of La Verne Co-op. Citrus Ass'n v. United States (9 Cir., 143 F.2d 415) the Court of Appeals for the Ninth Circuit had a somewhat similar question before it, as is here presented by plaintiffs, and in connection with an order under the same Act, as the amended order in this case was made. The Court ruled (143 F. 2d loc. cit. 420):
"Courts before have refused to hear defendants on points susceptible of correction by administrative procedures. In Bradley v. Richmond, 227 U.S. 477, 33 S.Ct. 318, 57 L.Ed. 603, a defendant, convicted of conducting business without a license, was not permitted to complain of his discriminatory classification under the licensing act because he had failed to pursue his administrative remedy, there being no want of due process in the scheme of the act. Very recently the Supreme Court refused to consider constitutionality as a defense in a criminal case under the Emergency Price Control Act of 1942 [50 U.S.C.A.Appendix § 901 et seq.] where the defendant had not attempted to question a price regulation through the channels and during the time provided in the act, Yakus v. United States [321 U.S. 414], 64 S.Ct. 660 [88 L.Ed. 834.] The court found no lack of due process of law although the Emergency Price Control Act requires the enforcement of regulations made under it until the final disposition of a case on judicial review, that is, until the completion of the statutory procedure for review.
"With respect to orders concerning rents under the Emergency Price Control Act the Supreme Court commented in Bowles v. Willingham [321 U.S. 503], 64 S.Ct. 641, 650 [88 L.Ed. 892]: `Here Congress has provided for judicial review of the Administrator's action. To be sure, that review comes after the order has been promulgated; and no provision for a stay is made. But as we have held in Yakus v. United States, supra, that review satisfies the requirements of due process. As stated by Mr. Justice Brandeis for a unanimous Court in Phillips v. Commissioner [of Internal Revenue], 283 U.S. 589, 596, 597, 51 S.Ct. 608, 611, 75 L.Ed. 1289 `Where only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process, if the opportunity given for the ultimate judicial determination of the liability is adequate. (Citing cases.) Delay in the judicial determination of property rights is not uncommon where it is essential that governmental needs be immediately satisfied.'"
Recognizing the position in which the law places them with regard to remedy, if any is called for, on increasing their selling price, plaintiffs complain that it was error for the Administrator to refuse to defer the effective date of the amended order until relief in this respect could be secured from the Office of Price Administration. At the hearing before this Court it was stated that a petition is now pending before the Office of Price Administration for relief. This complaint, even under the assumed facts of plaintiffs, as to increased paying price for milk under the amended order, does not appeal to a Court of Equity, in view of the fact that plaintiffs admit all increase, by their own standard, is being deposited in the registry of the Court, pending decision of this case. The question is now moot unless plaintiffs' request for suspension of the effective date of the order is to evade payment of the minimum prices fixed in the formula in the amended order even if they are unsuccessful in this suit.
With reference to time which may elapse between final determination of this action, if against plaintiffs, and order of Office of Price Administration, if on hearing the Office of Price Administration should find that there is no increased cost of milk, or the increased cost of producers' milk to the handlers does not justify an increase in the sale price of the handlers' product, the producers would have no remedy for the money due them under the amended order prior to the finding of the Office of Price Administration. Stated another way, the plaintiffs seek to make the amended order of the Administrator under the Agricultural Marketing Agreement Act contingent and effective on the order of the Office of Price Administration. Plaintiffs' rights can be protected in the Office of Price Administration proceeding in fixing ceiling prices. The producers' cannot. There is an orderly procedure for the solution of the problem posed by plaintiffs. Their proposal for deferment of the effective date of the amended order is not one of them.
Plaintiffs state that they were denied rights accorded them by the law in the procedure before the Administrator prior to the effective date of the order, January *230 1, 1944, in that (A) plaintiffs were not served with proposed finding and conclusions, after the promulgation hearing; (B) no proposed or tentative findings or conclusions were served on plaintiffs' exceptions to the amendment, until a ruling on the 15A proceedings was made; (C) plaintiffs were denied the right to make oral argument; (D) no joint act consultation with the Price Administrator was had by the War Food Director prior to issuance of the order.
The proposal upon which the amendments were later formulated is contained in a notice of hearing, dated August 27, 1943, signed by the Assistant to the War Food Administrator. By this notice a hearing was set for September 3, 1943. The record of the hearing of September 3, 4, 1943, shows that plaintiffs were represented by counsel. Following the promulgation hearing, the Acting Director of Food Distribution published his report, containing finding and conclusions, dated the 13th day of October, 1943. Plaintiffs filed "exceptions" to "Proposed Amendments to Marketing Agreement and Order Number Three as Amended." Plaintiffs were not then making any claim they were in the dark. Their brief then filed follows much the same line as the one now before this Court. Due consideration was given to the exceptions filed by the plaintiffs, certain of the exceptions were sustained, the proposed amended order was amended, and in other respects the exceptions were denied by the Assistant to the War Food Administrator on December 2, 1943. There was no requirement that finding and conclusions be made in the ruling on plaintiffs' exceptions to the amended order. Simply to overrule or sustain them was sufficient. Certainly no more rigorous procedure is required before the Administrator in hearing under the Act than would be required in a Court in ruling on exceptions to an order, which was supported by finding and conclusions. The proceedings were in accordance with Section 608c (3) of the Act, which provides: "Whenever the Secretary of Agriculture has reason to believe that the issuance of an order will tend to effectuate the declared policy of the Act with respect to any commodity or product thereof specified in subsection (2) of this section, he shall give due notice of, and an opportunity for a hearing upon a proposed order." On January 1, 1944, plaintiffs filed their "petition pursuant to Section 8c(15) (A) of the Agricultural Marketing Agreement Act," which provides that any handler subject to an order may file a petition with the Secretary of Agriculture, challenging the legality of any order, and praying relief, either by modification of or exemption from the order. The Act provides that he shall be given an opportunity for a hearing on such petition "in accordance with regulations made by the Secretary of Agriculture, with the approval of the President. After such hearing, the Secretary shall make a ruling upon the prayer of such petition which shall be final, if in accordance with law."
After the filing of the petition on January 1, 1944, a pre-hearing conference was held by the War Food Administrator on February 22, 1944, at which plaintiffs were represented by counsel, and on March 27, 28, a hearing was conducted on the petition filed by plaintiffs. The procedure was explained by the presiding officer before the hearing commenced (Record, pages 2, 3, 4, 5, and 6). Following the hearing, plaintiffs filed suggested findings of fact and conclusions of law, brief and argument. The Office of Distribution of the War Food Administrator did likewise. On June 8, 1944, the presiding officer made a report, the substance of which was to deny the petition of plaintiff. Copy was served upon the plaintiff and on June 27, the petitioners filed exceptions to the report of the presiding officer and requested an opportunity to present oral argument. Oral argument was heard on August 11, 1944, and on September 27, 1944, the Assistant to the War Food Administrator, after making findings of fact and conclusions, over-ruled the request of plaintiffs and dismissed plaintiffs' petition. It is our opinion that this procedure met the requirements of Section 608c (15) (A) of the Act. The Agricultural Marketing Act provides for certain findings as a basis for the issuance of an order. The findings made in the proceedings above referred to met the requirements of the Act, if in fact they did not go beyond the requirements of the Act. Pacific States Box & Basket Co. v. White, 296 U.S. 176, 56 S.Ct. 159, 80 L. Ed. 138, 101 A.L.R. 853. American Telephone & Telegraph Co. v. United States, D.C., 14 F.Supp. 121. A review of the record reveals that plaintiffs were at all times granted a hearing before rulings of the Administrator, were fully informed of rulings of the Administrator, and the findings *231 required by the Act, on which they were based. Plaintiffs, by able counsel, were represented at the hearings, and repeatedly by written brief and written and oral argument placed their position before the Administrator fully and at length. We find no denial to plaintiffs of due process in the various hearings. Before the amended order was issued, plaintiffs filed a brief and written argument in support of their exceptions to it. That they were not permitted also to present "oral" argument, at that time, was not a denial of due process or any procedural action due the plaintiffs as a matter of right. "Argument may be oral or written." Morgan v. United States, 298 U.S. 468, loc. cit. 481, 56 S.Ct. 906, 912, 80 L.Ed. 1288.
Plaintiffs make an exception to the amended order, based upon Executive Order 9250. Executive Order No. 9250 (see Code of Fed. Reg., Title 1-3 p. 1213) was issued under authority of the "Act of October 2, 1942 * * * entitled `An Act to Amend the Emergency Price Control Act of 1942.'" 56 Stat. 765, 50 U.S.C.A. Appendix § 961 et seq. Section 963 of the Emergency Price Control Act refers to fixing "maximum prices for agricultural commodities and products." Frequent reference is made in this section to fixing "maximum prices." We find no reference to the fixing of "minimum" prices. The same is true of Executive Order No. 9250. Take that portion quoted by plaintiffs in their brief:
"The price of agricultural commodities shall be established or maintained or adjusted jointly by the Secretary of Agriculture and the Price Administrator." Section 3, Title IV, 7 F.R. 7871.
It is from paragraph 3 of Title IV of the order, and is preceded in paragraph two by this language: "in establishing, maintaining or adjusting maximum prices for agricultural commodities * * *." Then follows Section 3, from which plaintiffs quote. The part quoted by plaintiffs is preceded and followed by words italicized:
"Subject to the directives on policy of the director, the price of agricultural commodities shall be established * * * jointly by the Secretary of Agriculture and the Price Administrator; any disagreement between them shall be resolved by the Director. * * *"
We do not think the Emergency Price Control Act and Executive Order No. 9250 made under it supersede the fixing of "minimum prices" under the Agricultural Marketing Agreement Act, but do not decide the question because it is not necessary to determine the present issue, under the view we take. If Executive Order No. 9250 does apply, then under Paragraph 3 of Title IV of the order, the Economic Stabilization Director has final authority, and he has approved the amended order the order. As to the Office of Price Administration participating in the proceedings, the record shows that two representatives of the Office of Price Administration attended the promulgation hearing. Plaintiffs were there represented. We cannot assume that the briefs and argument filed by plaintiffs were ignored by any of the parties required to pass upon the amended order. There is no evidence of any "disagreement" on the issuing of the amended order between the "Secretary of Agriculture (or Director) and the Price Administrator."
It is plaintiffs' final complaint that only after the petition filed by them under Section 608c (15) (A) of the Act had been ruled upon could the amended order become effective. We do not so read the provisions of the Act. Sections 608c (4) provides that the "Secretary of Agriculture shall issue an order" if certain findings are made upon the hearing. The hearing referred to is the promulgation hearing, which in this case was held on September 3, 4, 1943. Section 608c (15) (B), being the section providing for the filing of a petition by handlers for modification of an order, and for review of the rulings of the "Secretary of Agriculture" by a United States District Court, states that "The pendency of proceedings instituted pursuant to this subsection (15) shall not impede, hinder or delay the United States or the Secretary of Agriculture from obtaining relief pursuant to Section 608a (6) of this title," which is the enforcement section. It is self-evident that no order could be enforced unless it had been placed in effect. The administrator found that at the time the amended order was issued, the producers were entitled to the minimum price set forth in the amended order, and that the order was necessary to carry out the purposes set forth in the Act. See La Verne v. United States, supra, where it was held:
"By its terms the Act gives supremacy to the method outlined in § 608c (15) of testing the validity of orders. Proceedings *232 under § 608a (6) are to abate upon the rendering of a final decree in proceedings brought pursuant to § 608c (15), giving only a temporary effect to the decree of enforcement under the former section. Relief under the enforcement section is not to be deterred in any way by the pendency of proceedings under § 608c (15)."
We have read and considered the brief furnished by learned counsel for plaintiffs, but find that the complaint, together with the record, fails to show any facts upon which the relief prayed for in the complaint can be granted, and that the defendants' motion for summary judgment should be sustained.

Counterclaim.
The defendants have filed a counterclaim under the provisions of 7 U.S.C.A. § 608a (6), seeking an order against certain of the plaintiffs who have been engaged since January 1, 1944, in the handling of milk in the St. Louis area, and are therefore subject to the amended order effective on the last named date, but have failed to comply with it. These plaintiffs are alleged to have failed during the period from January 1, 1944, and to be still failing and refusing to pay producers for milk purchased at the minimum price set forth in the amended order. The plaintiffs referred to in the counter-claim do not deny the charge of non-compliance with the order, but challenge the jurisdiction of the Court for the reasons set forth in the complaint. Certain of the defendants have made payments into the registry of the Court of sums due producers if the amended order of the Administrator is approved. For the reason set forth above, we find that defendants are entitled to injunctive relief against plaintiffs: Pevely Dairy Company, Quality Dairy Company, St. Louis Dairy Company, Biermann's Dairy, Inc., Chapman Ice Cream Company, Clover Leaf Dairy Company, Golden Rod Dairy Company, Knackstedt Farm Dairy Company, Raskas Dairy Company, St. Charles Dairy Company, Valley Farm Dairy Company, and Bailey Farm Dairy Company, that they be enjoined from non-compliance with the amended order, and directed to comply with its provisions and to make payments to producers accordingly, payments to be made effective for each delivery period since January 1, 1944. Findings of fact and conclusions of law and judgment in accordance herewith will be submitted.
NOTES
[1] Since this case was heard by this Court Beatrice Creamery Company has, on stipulation, withdrawn as a party plaintiff and is no longer a party to the cause under the counter claim.
[2] "Sec. 608c (15) (A). Any handler subject to an order may file a written petition with the Secretary of Agriculture, stating that any such order or any provision of any such order or any obligation imposed in connection therewith is not in accordance with law and praying for a modification thereof or to be exempted therefrom. He shall thereupon be given an opportunity for a hearing upon such petition, in accordance with regulations made by the Secretary of Agriculture, with the approval of the President. After such hearing, the Secretary shall make a ruling upon the prayer of such petition which shall be final, if in accordance with law.

"(B) The District Courts of the United States (including the district court of the United States for the District of Columbia) in any district in which such handler is an inhabitant, or has his principal place of business, are hereby vested with jurisdiction in equity to review such ruling, provided a bill in equity for that purpose is filed within twenty days from the date of the entry of such ruling. Service of process in such proceedings may be had upon the Secretary by delivering to him a copy of the bill of complaint. If the court determines that such ruling is not in accordance with law, it shall remand such proceedings to the Secretary with directions either (1) to make such ruling as the court shall determine to be in accordance with law, or (2) to take such further proceedings as, in its opinion, the law requires."
[3] Section 903.3(e). "Classification of producer milk. The market administrator shall determine the classification of milk received by each handler from producers as follows:

"(1) Subtract from the total pounds of milk in each class the total pounds of milk, skim milk, and cream received from other handlers and allocated to such class pursuant to (c) of this section;
"(2) Subtract from the remaining pounds of Class I milk the pounds of milk received from sources other than producers or handlers which was disposed of as fluid milk outside the marketing area;
"(3) Subtract from the remaining pounds of milk in Class II (other than milk used for evaporated milk in hermetically sealed containers) an amount so utilized but not to exceed 5 per cent of the total receipts of milk from producers. Provided, That a smaller percentage shall be applied under this subparagraph if designated by the handler on his report made pursuant to Sec. 903.5(a) (1).
"(4) Subtract from the remaining pounds of milk in each class, in series beginning with the lower-priced Class II use, the pounds of milk, skim milk, and cream received from sources other than producers or other handlers; and
"(5) Add to the net figure for Class II milk computed under (4) of this paragraph, the amount subtracted under (3) of this paragraph."
[4] Handlers are defined in the order as "any person who, on his own behalf or on behalf of others, receives milk from producers, associations of producers, or other handlers, all, or a portion of which milk is disposed of as fluid milk in the marketing area, and who, on his own behalf or on behalf of others, engages in such handling of milk as is in the current of interstate commerce or which directly burdens, obstructs, or affects interstate commerce in milk and its products. This definition shall not be deemed to include any person who is a handler under another Federal Milk marketing agreement or order if such handler does not operate a plant from which bottled milk is distributed in the St. Louis, Missouri, marketing area."
[5] Producers are defined in the order as "any person, irrespective of whether such person is also a handler, who produces, under a dairy farm permit or rating for the production of Grade A or Grade B raw milk, milk which is received at a plant from which milk is disposed of as fluid milk in the marketing area. As used herein such `dairy farm permit or rating' means one issued by any of the health authorities duly authorized to administer regulations governing the quality of milk disposed of in the marketing area.
[6] Sec. 903.3 Classification of milk. "(a) Basis of classification. The market administrator shall classify, on the basis of the classes set forth in (b) of this section and subject to the conditions of (c), (d), and (e) of this section, all milk, skim milk, and cream (including milk of the handler's own production) received by each handler during the delivery period. In establishing the classification of milk received by a handler from producers, the burden rests upon such handler to account for such milk and to prove to the market administrator that such milk should not be classified as Class I milk."
[7] Compare Nebbia v. New York, 291 U. S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A. L.R. 1469, with Ribnik v. McBride, 277 U.S. 350, 48 S.Ct. 545, 72 L.Ed. 913, 56 A.L.R. 1327.
[8] Compare United States v. Rock Royal Co-op., 307 U.S. 533, 59 S.Ct. 993, 83 L. Ed. 1446, with Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L. Ed. 446, and Schechter Corporation v. U. S., 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947.
[9] The record shows that since the amended order has been in effect, the volume of imported milk has decreased for Class One uses.
[10] Under an agreement between plaintiffs and defendants, plaintiffs claim (see reply to counterclaim) they are paying into the registry of the Court, subject to final determination of this case, the price increases, resulting under the amended order. From January 1st, 1944 to April 20, 1944, $135,587.02 had been deposited. Originally deposits were made by thirteen of the plaintiffs. The last deposit was made by only eight of the twenty-two plaintiffs who filed this case. Between the first and last deposit apparently five handlers ceased to pay any increase to producers. At the time of the last deposit, if only eight handlers were paying any increase to producers, it would seem to follow that the amended order gave no general price increases. The records of the Clerk's office show an average deposit of approximately $8,000 for each month. If made by eight handlers, it averaged $1000 per month for each handler. If made by fourteen handlers, it averaged less than $600 per month. When such sums are divided among all of the handlers' producers for a month, the increase to each producer is apparently not substantial.
[11] For further testimony on this subject, see pages 32, 53, 94, 164, 178, and 194 of the promulgation record.